UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

TRACY CROSS,                                )
                                            )
            Plaintiff,                      )
                                            )
        vs.                                 )       Case No. 4:12-CV-2322 (CEJ)
                                            )
CAROLYN W. COLVIN,[1] Acting                )
Commissioner of Social Security,            )
                                            )
            Defendant.                      )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social
Security Administration.

## I. Procedural History

On January 15, 2009, plaintiff Tracy Cross filed applications for supplemental
security income, Title VI, 42 U.S.C. §§ 1381 *et seq.*, and disability insurance benefits,
Title II, 42 U.S.C. §§ 401 *et seq.*, with an alleged onset date of September 1, 2008.[2]
(Tr. 170-72, 175-81). After plaintiff's applications were denied on initial consideration
(Tr. 60-62, 80-83), she requested a hearing before an Administrative Law Judge (ALJ).
(Tr. 84-85). Following a hearing on December 14, 2009, (Tr. 46-59), the ALJ issued
a decision denying plaintiff's applications on February 4, 2010. (Tr. 63-76). On May
12, 2011, the Appeals Council vacated the hearing decision and remanded plaintiff's
case to the ALJ with instructions to "[g]ive further consideration to the treating source
opinions . . . and explain the weight given to such opinion evidence," obtain additional

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on
February 14, 2013. Pursuant to Fed.R.Civ.P. 25(d), she is substituted for Michael J.
Astrue as the defendant in this case.

[2]Plaintiff subsequently amended the date of onset to October 2, 2008. (Tr. 191).

evidence, give further consideration to plaintiff's residual functional capacity and, if warranted, obtain supplemental evidence from a vocational expert.  (Tr. 77-79).  Plaintiff and counsel appeared for an additional hearing on September 1, 2011.  (Tr. 26-45).  The ALJ again denied plaintiff's applications on September 19, 2011.  (Tr. 6-25).  The Appeals Council denied plaintiff's request for review on October 19, 2012.  (Tr. 1-5).  Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II.  Evidence Before the ALJ

### A.  Disability Application Documents

In her Disability Report (Tr. 224-31), plaintiff listed her disabling conditions as problems with her lower back and left leg.  She stated that she could not sit or stand for long and had to hold on to something when she stood or walked because her leg sometimes gave out.  She experienced back strain if she lifted more than 5 or 10 pounds.  She was in constant pain and had been unable to go anywhere for the prior four months due to the pain.  Plaintiff took several medications, including those for the treatment of allergies, migraines, overactive bladder, and Type 2 diabetes.  In addition, she took Naproxen, Hydrocodone and Tizanadine for pain, Gabapentin for treatment of neuralgia, and Alprazolam and Cymbalta for the treatment of depression and anxiety.  (Tr. 247, 255).

Plaintiff completed a Function Report on February 21, 2009.  (Tr. 204-14).  Her daily activities included getting her children up for school, eating meals, sleeping, and watching television.  She was unable to sleep for more than 1 or 2 hours due to pain.  She mainly ate frozen dinners, snacks, and sandwiches.  The only housework she was able to complete was washing dishes and cleaning the bathroom sink.  She did not need reminders to take her medication and was able to pay bills and use a checkbook.

-2-

She had not driven for 6 months.  The only place she went on a regular basis was the grocery store.  She saw her brother and sister twice a week.  She had no problems getting along with others, including authority figures.  She stated that she handled stress with the help of medication but found changes in routine difficult.  Plaintiff stated that she could only walk 20 to 30 steps before she needed to rest for 10 minutes.  She had difficulties with lifting, climbing stairs, squatting, walking, sitting, bending, kneeling, standing, reaching, and completing tasks; her memory and concentration were affected by medication.  She used a cane on a daily basis and a walker when in extreme pain.  She used to be able to skate, exercise, and dance, but was no longer able to do so, and she had gained 100 pounds since her illness began.

## B.  Hearings

Plaintiff was 40 years old at the time of the hearing on December 14, 2009.  She lived with her 9-year-old daughter, a 13-year-old niece of whom she had custody, and her brother.  (Tr. 54).  She had a high school diploma and had worked as a certified nursing assistant until 1996, after which she worked as a home health care provider until 2004.   She initially stopped working because she suffered from migraine headaches but then the agency she worked for closed.  (Tr. 49).  She had not worked since 2004.

Plaintiff stated that she had sciatica which caused constant pain in her left leg and made it difficult for her to walk.  (Tr. 51).  She had gained more than 30 pounds due to inactivity since she stopped working.  She had received four spinal injections but they provided no relief.  Her doctors recommended that she have surgery but she could not find a surgeon who took Medicaid.  (Tr. 50).  She also suffered from migraine

-3-

headaches following a spinal tap in 2003 during which her spinal cord was punctured. (Tr. 52).

Plaintiff testified that she had constant pain in her back and leg, which was made worse by sitting for a long time, standing, or going up and down stairs. Medication and heating pads helped. She was most comfortable lying down. Her brother and children handled most of the housework and her sister went grocery shopping for her. (Tr. 54).

At the time of the second hearing on September 1, 2011, plaintiff still resided with her daughter and niece. Her brother was in the home "off and on to help out" and her sister came over to cook, because plaintiff found it too painful to stand.

The ALJ asked plaintiff about the impact of her obesity on her daily activities. She agreed that her weight aggravated her leg and back pain and made all activities more difficult. She testified that she had constant stabbing pain in her lower back that radiated into her left leg. (Tr. 33-34). The pain worsened when she sat for more than half an hour, stood for 20 or 30 minutes, or walked a half block. (Tr. 34, 36). She experienced "a lot" of relief from lying down with a heating pad and estimated that she spent six hours out of eight lying down. (Tr. 38). Epidural and nerve root blocks were helpful for a day or two. (Tr. 34-35). She used a cane because she fell often, but using the cane caused numbness in her hands. (Tr. 35). She could not lift or carry more than 10 to 15 pounds. (Tr. 37).

Plaintiff reported numbness, tingling and pain in her hands due to carpal tunnel syndrome. She had participated in one session of physical therapy covered by her insurance and did home exercises prescribed by the therapist, though they did not provide relief. She wore a splint when sleeping and that did help. (Tr. 30). The carpal tunnel condition made it difficult for her to manage buttons and to sweep or mop.

-4-

Plaintiff took medication for depression and anxiety but did not receive treatment from a psychologist or psychiatrist. (Tr. 31-32). She stated that anxiety caused "breakdowns," during which she cried and felt like staying in her room. (Tr. 32, 35). She was afraid to drive so her sister drove her to the grocery store. Plaintiff testified that her medications caused drowsiness and made it hard for her to focus. (Tr. 34). She usually fell asleep after taking her morning medications. (Tr. 38).

Dolores E. Gonzalez, M.Ed, a vocational expert, provided testimony regarding the employment opportunities for an individual with plaintiff's education, training and work experience, with the ability to lift and carry 20 pounds occasionally, and 10 pounds frequently; who was able to stand, walk and sit for 6 hours out of 8; who could occasionally climb stairs and ramps, stoop, kneel, crouch and crawl; was barred from constant use of foot controls with the left leg; and was limited to occasional handling, fingering, and manipulation with the left hand. Ms. Gonzalez opined that such an individual would not be able to perform plaintiff's past relevant work -- which she characterized as medium, semi-skilled work -- but could perform light unskilled work, including furniture rental consultant or tanning salon attendant. (Tr. 41-42). Both jobs could still be performed by an individual who also had limitations on using the right hand. The vocational expert was next asked to assume that the individual was limited to lifting and carrying 10 pounds occasionally, and less than 10 pounds frequently, and with the capacity to stand or walk 2 hours out of 8, and sit for 6 hours out of 8. Ms. Gonzalez testified that such an individual could perform sedentary work, such as a call-out operator or surveillance system monitor. In response to questioning by plaintiff's counsel, Ms. Gonzalez testified that these two positions could be performed by an individual who needed to alternate between sitting and standing. An individual who

required rest periods beyond 30 minutes for lunch and two 15-minute breaks in a work day would require accommodation to be employable. (Tr. 43-44).

## C. **Medical Records**

Between January 2008 and June 2011, plaintiff had 29 office visits with her primary care physician, William Wilcox, M.D.[3] In January 2008, plaintiff expressed concern about her weight, which exceeded 260 pounds, and complained of persistent back pain associated with a urinary tract infection. Her migraines were controlled by Topamax. (Tr. 283, 285). In September 2008, Dr. Wilcox noted that plaintiff had bilateral carpal tunnel syndrome, which caused pain, numbness and tingling that worsened with use. She received a refill of her prescription for Naproxen. (Tr. 289). In October 2008, plaintiff twisted her left knee while lifting a patient. Dr. Wilcox prescribed nonsteroidal anti-inflammatory medications and home exercises. (Tr. 291). On October 11, 2008, plaintiff sought emergency care for pain in her knee, which she rated at level 8 on a 10-point scale. She also complained of nagging back pain. X-rays of the left knee showed no fracture, dislocation, or significant arthritic changes. Plaintiff received an injection of Toradol. She was diagnosed with sciatica and referred to an orthopedic surgeon. (Tr. 259-78). On October 17, 2008, plaintiff reported to Dr. Wilcox that her insurance would not cover physical therapy or the orthopedic surgeon to whom she was referred. (Tr. 293). He prescribed Zanaflex, Naproxen, and Tramadol.

In January 2009, plaintiff reported to Dr. Wilcox that her back and leg pain were getting worse. She saw a physical therapist one time, but her insurance did not approve additional visits. Plaintiff was taking her prescribed medications consistently,

---

[3]There are no records for medical care between January and June 2008.

but was still unable to work. She complained of weight gain. Dr. Wilcox noted that plaintiff's back pain had not improved with conservative treatment and that her insurance did not cover physical therapy. He ordered a continuation of her current medications and referred her to pain management services. (Tr. 295). An MRI of the lumbar spine completed on February 3, 2009, disclosed evidence of instability at the L4-5 level with neural foraminal encroachment, and a small disc herniation at T11-12 with migration of disc material. (Tr. 282).

Plaintiff saw pain management specialist Mahendra Gunapooti, M.D., on March 2, 2009. Plaintiff reported that she had pain in her low back and left leg, which she rated at level 10 on a 10-point scale. She described the pain as stabbing, shooting, tingling, and throbbing, and indicated that she also experienced numbness. The pain was aggravated by sitting, standing, twisting, leaning, walking, working, and occasionally by lying down. The pain was relieved by medication, hot packs and lying down. Plaintiff indicated that she also experienced depressive mood, anxiety, sleep disturbance, irritability, weakness, and muscle spasms. (Tr. 311). She denied neurological deficits. On examination, Dr. Gunapooti noted that plaintiff had normal range of motion at the lumbar spine but experienced pain. Palpation over the lumbar region produced slight tenderness. Motor strength, deep tendon reflexes, and sensory responses were normal. Straight leg raising, Patrick's test[4] and Romberg's sign[5] were all negative. Dr. Gunapooti diagnosed plaintiff with chronic severe lumbar

---

[4]The Patrick (FABER) test is used to identify the presence of hip pathology by attempting to reproduce pain in the hip, lumbar spine and sacroiliac region. http://www.physio-pedia.com/FABER_Test (last visited on Nov. 29, 2012).

[5]The Romberg test is used test to demonstrate the effect of posterior column disease upon human upright posture control. http://www.physio-pedia.com/Search_ result?q=romberg (last visited Nov. 4, 2013)

radiculopathy, lumbar degenerative disc disease, diffuse disc bulging at L4-5, and lumbar spondylosis. He recommended a lumbar epidural steroid block and directed plaintiff to continue her home exercise program. (Tr. 322-23).

A nonexamining consultant[6] completed a Physical Residual Functioning Capacity Assessment (PRFCA) on March 19, 2009. Based on a review of the medical records, the consultant determined that plaintiff had the capacity to occasionally lift or carry 10 pounds; frequently lift or carry less than 10 pounds; and stand or walk about 2 hours and sit for about 6 hours in an 8-hour workday, with limitations on pushing and pulling using the legs. She was restricted from crouching, crawling, kneeling, and balancing, and could only occasionally climb a ramp or stairs. (Tr. 324-30).

On April 8, 2009, Dr. Gunapooti administered a lumbar epidural block to treat severe lumbar radiculopathy. (Tr. 379). This was the first of nine injections Dr. Gunapooti administered for the treatment of back and neck pain. (Tr. 378; 377; 375; 372; 404; 595; 593; 592). Plaintiff generally reported initial relief, followed by the return of pain. On April 8, 2009, plaintiff reported to Dr. Wilcox that she had "always had back problems off and on, but never like this, with the pain down my leg and unable to do anything." (Tr. 336). She rated the pain as 9 on a 10-point scale and complained of weakness and numbness in her left leg. Dr. Wilcox assessed plaintiff as having sciatica, possibly due to degenerative joint disease at intervertebral facet joints. (Tr. 338-39). He stated that plaintiff could sit for 20 minutes, stand for

---

[6]The form indicates that the PRFCA was completed by a Single Decisionmaker (SDM). Missouri is one of 20 states in which nonmedical disability examiners are authorized to make certain initial determinations without requiring a medical or psychological consultant's signature. See Office of the Inspector General, Audit Report Single Decisionmaker Model – Authority to Make Certain Disability Determinations without a Medical Consultant's Signature (Aug. 2013).

5 to 10 minutes, walk for 5 minutes, and lift 5 to 10 pounds. On examination, Dr. Wilcox observed that plaintiff was limping and that straight-leg raising produced pain at 90 degrees. He also noted unspecified muscle weakness. (Tr. 338). Plaintiff's weight exceeded 275 pounds.

On June 23, 2009, after two more lumbar blocks, Dr. Wilcox noted that straight leg raising was positive at 45 degrees. Plaintiff's reflexes, strength, and sensation were normal. He decided to refer plaintiff to a spinal surgeon. (Tr. 343). On July 22, 2009, Dr. Wilcox noted that plaintiff was using up her prescribed pain medications too quickly. She reported that was unable to locate a surgeon that accepted her insurance. On September 1, 2009, Dr. Wilcox noted that plaintiff's back pain, while still constant, was perhaps a little better. Plaintiff still experienced pain, numbness, and tingling in her left leg from her low back to her ankle. (Tr. 354).

On August 13, 2009, Dr. Gunapooti noted that plaintiff had severe low back and leg pain, with intermittent tingling and numbness, but no neurological deficits. (Tr. 373). She had decreased range of motion at the lumbar spine and slight tenderness on palpation. Results of straight leg raising and Patrick's test were both negative. Dr. Gunapooti's impression was lumbar spondylosis, lumbar radiculopathy, lumbar degenerative disc disease, and a history of multilevel lumbar diffuse disc bulging.

On November 9, 2009, Dr. Wilcox gave plaintiff written instructions to address plantar fasciitis. (Tr. 387-90). The treatment notes do not explain why plaintiff received this information.

On November 19, 2009, Dr. Gunapooti completed a Physician's Assessment for Social Security Claim. (Tr. 391). Plaintiff's diagnoses at that time were severe chronic lumbar radiculitis, lumbar spondylosis, and L4-5 diffuse disc bulging. Plaintiff's

symptoms were severe chronic low back pain with radiation to her legs down to her feet. She was treated with Vicodin and Zanaflex. Her insurance precluded physical therapy or a neurosurgical consultation. Dr. Gunapooti opined that plaintiff might need to rest for 10 to 15 minutes every 2 hours, with intermittent changes in position. She had low tolerance for sitting or standing and could not lift more than 10 pounds. Plaintiff was unable to work due to the intensity of her back pain caused by severe sciatica.

Dr. Wilcox completed a Physician's Assessment for Social Security Claim on December 7, 2009. (Tr. 392). He listed plaintiff's diagnoses as degenerative disc disease, L4-5 bulging disc, bilateral facet joint disease, and probable instability at L4-5. According to Dr. Wilcox, plaintiff was restricted from twisting, bending, lifting more than 20 pounds, and standing more than 10 minutes.

On January 12, 2010, Dr. Wilcox noted that plaintiff's back pain persisted and was present on the right side as well as the left. (Tr. 407-15). On February 8, 2010, Dr. Wilcox noted that plaintiff had back, hip, and knee pain, and that her insurance would not pay for Flexeril, Zanaflex, and Soma. (Tr. 416). On February 18, 2010, Dr. Gunapooti noted that plaintiff had chronic low back pain with radiation to both legs, more so on the left side. The pain was slowly increasing. In addition, plaintiff had chronic neck pain. (Tr. 402). An MRI on March 1, 2010, disclosed mild reversal of the cervical curvature and diffuse disc dessication throughout the cervical spine. There was mild loss of disc height at C4-5 and C5-6 and hypertrophic spurs. The MRI showed mild central canal stenosis at C4-5, C6-7, and C7-T1, and severe central canal stenosis at C5-6. (Tr. 400).

On March 12, 2010, plaintiff reported to Dr. Wilcox that her hands and most of her body had been aching for two days. Her back pain persisted and was present on the right side as well as the left. (Tr. 437). She also complained of pain in her arm. On April 7, 2010, Dr. Wilcox completed a depression questionnaire. Plaintiff indicated that she was sad or irritable, had lost interest in activities, had changes in appetite and sleep, was agitated or restless, had difficulty concentrating, constant fatigue, frequent feelings of worthlessness or guilt, and frequent thoughts of death or suicide. (Tr. 446). Dr. Wilcox prescribed Cymbalta to address depression and, on May 6, 2010, plaintiff reported that she was more social, less irritable, and struggling less with feelings of worthlessness or guilt. (Tr. 455).

On June 30, 2010, Matthew Harms, M.D., of the Washington University Neuromuscular Clinic evaluated plaintiff's lower back pain. (Tr. 429-31). Dr. Harms noted that plaintiff had lifelong trouble with low back pain that had become particularly pronounced over a two-year period. The pain was centered in the left lower spine with occasional radiation to the right hip and down the left leg. She had occasional weakness in that her left leg sometimes gave out. She experienced occasional stress incontinence in response to "bad" muscle spasms. On examination, Dr. Harms noted that plaintiff had nearly full strength of upper and lower extremities. She had decreased sensation in the right toes and entire left leg. Deep tendon reflexes could not be elicited, "even with Jendrassik maneuver."[7] She had an antalgic gait. She was able to stand briefly on her heels and toes. In summary, Dr. Harms found that plaintiff

---

[7]If deep tendon reflexes appear to be absent, they may be elicited by augmentation with Jendrassik's maneuver, such as having the patient clasp hands together tightly and try vigorously to pull apart while a tendon in the lower extremity is tapped. See Merck Manual of Diagnosis and Therapy 1592, 1602 (19th ed. 2011).

had chronic low back pain with distal neuropathy.  He described the sensory loss in the left leg as unusual and unlikely to be related to peripheral nerve damage.  He ordered nerve conduction studies to investigate radiculopathy and blood work to look for reversible causes of the neuropathy.

A clinical electromyography evaluation completed on August 24, 2010, provided "evidence for sensory neuropathy and moderate left carpal tunnel syndrome."  (Tr. 432-33).  X-rays of the cervical and lumbar spine on October 18, 2010, showed reversal of the normal cervical curvature and straightening of the normal lordotic curvature, in addition to torticollis[8] and rotoscoliosis.[9]  (Tr. 583-85).  There was evidence of degenerative disc disease at C4-5 and C5-6 and, to a lesser degree at C6-7 and C7-T1; plaintiff had mild degenerative disc disease throughout the lumbar spine, which was greatest at L2-3.  In addition, plaintiff had mild bilateral neuroforaminal narrowing, spondylosis, spondylolisthesis,[10] and bilateral facet hypertrophy.

On November 22, 2010, Dr. Wilcox noted that plaintiff was using a cane because she was getting more unsteady on her feet.  (Tr. 517).  She also had pain from her elbows to her hands.

On January 24, 2011, Dr. Wilcox noted that plaintiff's depression had worsened and he increased the dosage of her Cymbalta.  (Tr. 530).  On June 29, 2011, Dr. Gunapooti listed plaintiff's active problems as: cervical radiculopathy; cervical, lumbar,

---

[8]A contraction of the muscles of the neck, chiefly those supplied by the spinal accessory nerve, in which the head is drawn to one side.  Stedman's Med. Dict. 1847 (27th ed. 2000).

[9]Combined lateral and rotational deviation of the spinal column.  Stedman's Med. Dict. 1581 (27th ed. 2000).

[10]Spondylolisthesis is a condition in which a bone (vertebra) in the spine slips out of the proper position onto the bone below it.  http://www.ncbi.nlm.nih.gov/pubmed health/PMH0002240/ (last visited on Oct. 5, 2012).

and lumbosacral disc degeneration; neuritis; and spondylosis without myelopathy. He gave plaintiff a cervical epidural injection. (Tr. 596).

Dr. Wilcox completed a second disability assessment on August 12, 2011. (Tr. 598). He listed plaintiff's diagnoses as chronic low back pain and bilateral carpal tunnel syndrome, with muscle spasms, nerve pain down the left leg, and numbness of fingers. Dr. Wilcox opined that plaintiff would be able to work for 20 to 30 minutes before she needed to "lie down and/or walk typically for an hour." He stated that she was unable to work.

### III. The ALJ's Decision

In the decision issued on September 19, 2011, the ALJ made the following findings:

1.  Plaintiff met the insured status requirements through December 31, 2009.

2.  Plaintiff has not engaged in substantial gainful activity since October 2, 2008, the amended date of onset.

3.  Plaintiff has the following severe impairments: residuals from bilateral carpal tunnel syndrome, degenerative disc disease of the cervical and lumbar spine, and obesity.

4.  Plaintiff does not have an impairment or combination of impairments that meets or substantially equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  Plaintiff has the residual functional capacity to perform sedentary work with the following limitations: she can never climb ladders, ropes, or scaffolding, and can occasionally climb steps or ramps; she can occasionally stoop, kneel or crouch; she may not engage in constant use of foot controls on the left side; and is limited to occasional handling, fingering, and gross and fine manipulation on both sides. She must avoid concentrated exposure to extreme cold, unprotected heights, and vibration.

6.  Plaintiff is unable to perform her past relevant work.

7.      Plaintiff was 39 years old, a younger individual, on the alleged ate of onset.

8.      Plaintiff has a high school education and can communicate in English.

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding of "not disabled" whether or not plaintiff has transferable job skills.

10.     Considering plaintiff's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that plaintiff can perform.

11.     Plaintiff has not been under a disability, as defined in the Social Security Act, from October 2, 2008, through the date of the decision.

(Tr. 9-21).

## IV.  Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997).  "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion."  Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)).  If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. § 423(a)(1)(D),

-14-

(d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). "Each step in the disability determination entails a separate analysis and legal standard." Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five. Id.

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3)

the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V. Discussion

Plaintiff asserts that the ALJ improperly evaluated the opinions of her treating physicians, Dr. Wilcox and Dr. Gunapooti, whose assessments of her limitations precluded employment. (Tr. 391, 392, 598). In particular, plaintiff asserts the ALJ erred by failing to define the weight he gave the treating source opinions, improperly failed to give the opinions controlling weight, and failed to provide good reason for discounting the opinions.

Generally, a treating physician's opinion is given more weight than other sources in a disability proceeding. Anderson v. Astrue, 696 F.3d 790, 793 (8th Cir. 2012); (citing 20 C.F.R. § 404.1527(c)(2)). Indeed, when the treating physician's opinion is supported by proper medical testing, and is not inconsistent with other substantial evidence in the record, the ALJ must give the opinion controlling weight. Id. "However, [a]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010) (alteration in original) (internal quotation omitted). Ultimately, the ALJ must "give good reasons" to explain the weight given the treating physician's opinion. 20 C.F.R. § 404.1527(c)(2). An ALJ may not substitute his own opinions for the opinions of medical professionals. Ness v. Sullivan, 904 F.2d 432, 435 (8th Cir. 1990) (ALJ erred in substituting his opinion that plaintiff did not seem depressed at hearing for doctor's assessment of plaintiff's mental health); see also Pate-Fires v. Astrue, 564 F.3d 935,

946-47 (8th Cir. 2009) (ALJs may not "play doctor"); <u>Rohan v. Chater</u>, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

### A.    <u>Failure to explain weight given to treating source opinions</u>

As discussed below, the ALJ did not give controlling weight to the opinions of Drs. Wilcox and Gunapooti. Plaintiff argues, and defendant essentially concedes, that the ALJ never explained what, if any, weight he gave their opinions. Plaintiff argues that this failure violates the requirement to "evaluate every medical opinion" received in evidence. <u>See</u> 20 C.F.R. § 404.1527(c). It is clear, however, that the ALJ "evaluated" the opinions, albeit unfavorably.

The record contains no other medical assessment of plaintiff's limitations. Thus, plaintiff argues, the ALJ's failure to assign a weight to the treating source opinions casts doubt on the basis for his RFC determination. "The ALJ bears the primary responsibility for determining a claimant's residual functional capacity based on all relevant evidence, <u>but residual functional capacity remains a medical question</u>." <u>Krogmeier v. Barnhart</u>, 294 F.3d 1019, 1023 (8th Cir. 2002) (emphasis added). Defendant argues that the record need not contain a medical opinion setting forth specific limitations in order to assess a claimant's RFC. Defendant is correct that an "ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians." <u>Martise v. Astrue</u>, 641 F.3d 909, 927 (8th Cir. 2011) (alteration in original; internal quotation omitted). But that is not the same as saying that an ALJ may discount all medical opinions and rely on his own determinations from the medical evidence. <u>Nevland v. Apfel</u>, 204 F.3d 853, 858 (8th Cir. 2000) (ALJ may not draw his own inferences from the medical reports);

Martise, 641 F.3d at 927 (no error in discounting opinion of treating physician where ALJ credited opinions of other treating and examining physicians). It appears that this is what occurred in this case and the matter must be remanded for further proceedings.

### B. Failure to give controlling weight to treating sources

An ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000)). If the doctor's opinion is "inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight." Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007) (citation omitted).

Here, the ALJ discounted the limitations imposed by Drs. Wilcox and Gunapooti as inconsistent with their own clinical observations. (Tr. at 19) (describing medical source statements as "a simple recitation of the [plaintiff's] reports to [her] doctors who may be motivated by sympathy toward a good patient or simply to avoid saying no."). As the ALJ noted, both physicians routinely found that plaintiff had normal motor strength, sensation, and deep tendon reflexes. However, Dr. Wilcox also found that plaintiff had antalgic gait, positive straight leg raising and painful range of motion, (see e.g., Tr. 343, 349, 357, 384), and Dr. Gunapooti noted that plaintiff had decreased range of motion and tenderness on palpation. (See, e.g., Tr. 322, 373). The ALJ did not cite a medical source for his conclusion that these clinical observations, taken as a whole, are inconsistent with the limitations imposed by plaintiff's treating

physicians. The Court concludes that the ALJ improperly substituted his opinion for those of the medical professionals.

The ALJ also found that the medical source statements were unsupported by objective medical evidence. (Tr. 19). An MRI in February 2009 found instability at the L4-L5 level with right neural foraminal encroachment and a small central T11-T12 disc herniation with superior migration of disc material. (Tr. 282). The following year, an MRI of the cervical spine disclosed a mild reversal of normal cervical curvature, diffuse disc dessication, mild loss of disc height and hypertrophic spurs. In addition, there was central canal stenosis throughout the cervical spine, ranging from mild to severe. (Tr. 400). X-rays in October 2010 showed structural anomalies of the cervical[11] and lumbar spine[12] with evidence of degenerative disc disease, spondylosis, spondylolisthesis, and facet hypertrophy. (Tr. 583-85). These objective clinical findings are at least consistent with the opinions of plaintiff's treating physicians. In the absence of a contrary medical interpretation of the clinical findings, the ALJ appears to have relied on his own reading of this evidence to conclude that the treating source opinions were not supported by objective medical evidence.

## C. Failure to provide "good reason" for discounting opinions

The ALJ made a number of medical interpretations of evidence in the record. For example, Dr. Harms recorded that plaintiff had "decreased pinprick of the entire left leg" which he opined was "unusual . . . and unlikely to be related to peripheral

---

[11]Reversal of the normal curvature of the cervical spine, torticollis, and mild neuroforaminal narrowing.

[12]Straightening of normal lordotic curvature and mild rotoscoliosis; spondylolistheis of L4 on 5; mild degenerative disc disease and spondylosis throughout lumbar spine, worst at L2-3; mild rotoscoliosis; and bilateral facet hypertrophy at L4-5 and L5-S1.

nerve compression."  (Tr. 430-31).  The ALJ interpreted Dr. Harms's statement as

follows:  "In other words, the claimant's story to the doctor about her reported sensory

deficits did not fit any known neurological abnormality, but it was consistent with an

effort to appear . . . more limited than any actual pathological findings would reveal."

(Tr. 18).  To support his conclusion, the ALJ noted that the electromyography did not

show any definitive clinical abnormalities of the left leg.  (Tr. 17).  However, the left

sural SNAP[13] and tibial H-reflexes were absent.  (Tr. 425).  These clinical findings may

or may not support plaintiff's reported decreased sensation in her left leg -- the record

does not contain a physician's assessment of these test results.  In the absence of a

medical interpretation of these findings, the ALJ erred in concluding that plaintiff was

fabricating the experience.[14]  The ALJ similarly reached an improper medical conclusion

with respect to plaintiff's treatment for plantar fasciitis,[15] stating that "[i]t is very

inconsistent to have severe foot pain if one is unable to stand or walk for more than

brief periods."  (Tr. 19).  Again, the ALJ's conclusion is not supported by citation to any

medical authority.  If the ALJ relied on his independent analysis of the medical record

in determining the weight to give to treating-source opinions, that was error.

Based on the errors detailed above, this matter will be remanded for

reevaluation of the treating source opinions.  If clarification is required in order to

---

[13]SNAP = sensory nerve action potential.  Tr. 426.  The sural nerve is a nerve in the leg.

[14]In addition, Dr. Harms was unable to elicit deep tendon reflexes even with the Jendrassik maneuver, a maneuver intended to distract a patient's awareness etc..

[15]Dr. Wilcox's office issued plaintiff instructions for caring for plantar fasciitis on November 9, 2009.  (Tr. 388-90).  The Court has not found any other mention of this condition in the record, including the extensive treatment notes for that office visit or any other.  So, the reason for issuing these instructions is unknown.

properly assess plaintiff's functional limitations, the ALJ should seek additional statements from plaintiff's treating physicians or obtain a consultative evaluation.

The Court takes the opportunity to address another issue: plaintiff was evaluated by Dr. Harms through the Washington University School of Medicine Neuromuscular Clinic. He noted that plaintiff would need a referral to a neurosurgeon if further testing revealed that she had acute nerve loss. (Tr. 431). Plaintiff had informed Dr. Harms that she was unable to find a neurosurgeon that would accept Medicaid. The ALJ found that her statement was "inconsistent with the fact that Washington University School of Medicine accepted [plaintiff] as a Medicaid patient." (Tr. 18). The ALJ did not explain the basis for this conclusion, which is called into question by Dr. Harms himself, who stated that he had "no additional ideas about how to find [a neurosurgeon] that takes her insurance." (Tr. 429). The ALJ appears to have relied on this improper inference in assessing plaintiff's credibility and should refrain from doing so on remand.

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is not supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

A separate judgment in accordance with this Memorandum and Order will be entered.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 29th day of January, 2014.

-22-